## LUTEN v. MARSH et al.

### (District Court, S. D. Iowa, C. D. January 7, 1919.)

### No. 4009.

1. PATENTS ⊕→328—INVENTION—CONCRETE BRIDGE.
   The Luten patent, No. 852,970, for concrete bridge, *held* void for lack of invention.
2. PATENTS ⊕→328—INVENTION—ARCH STRUCTURE.
   The Luten patent, No. 853,202, for arch structure, *held* void for lack of invention.
3. PATENTS ⊕→328—VALIDITY AND INFRINGEMENT—REINFORCING CONCRETE BRIDGES.
   The Luten patent, No. 853,203, for method of reinforcing concrete arches in bridges, *held* void for lack of invention; also *held* not infringed, if conceded validity.
4. PATENTS ⊕→328—INVENTION—WALL.
   The Luten patent, No. 934,411, for wall, *held* void for lack of invention.

In Equity. Suit by Daniel B. Luten against J. B. Marsh and others. Decree for defendants.

Hood & Schley, of Indianapolis, Ind., for complainant.
Wallace R. Lane, of Chicago, Ill., and Henry E. Sampson, of Des Moines, Iowa, for defendants.

WADE, District Judge. I am going to dispose of this case now, notwithstanding the fact that it must be self-evident that I have not had time to study the various items of evidence presented here upon both sides, and, if I had any doubt in my mind as to what the decision ought to be, I would take the time to go through this record more carefully. But I have not the time to study this record within the next few months, and I feel that this is a case that should be promptly disposed of—first, because of the public importance of it, the far-reaching effect it may have; and, second, because of some of the methods, disclosed here, which have been employed by the plaintiff in the business of constructing bridges or getting the business of designing bridges. These methods no court can approve—some of them, at least. I am not sure but what they ought to be construed as sufficient to deny the party relief on the ground that he does not come into court with clean hands. I refer especially to the half-truths, which are worse than falsehoods, in some of these representations made to contractors; because, when a man recites a list of cases as having been tried, or in which decisions have been rendered, without disclosing that nearly all of them have been consent decrees, it is not the truth. It is only half the truth. Those consent decrees should never have been utilized for any such purpose. It ought to appear upon their face, stamped plainly "by consent of parties," and not be held out as the solemn action of the court, which has never inquired into the facts at all. In fact, I am not sure but that there ought to be a prohibition of consent decrees in patent cases, because of the fact that they are by some per-

⊕→For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

sons used as the basis of obtaining settlements, when the one party knows that the decree is not the decree of the court, but the decree prepared by consent of parties and simply approved by the court without investigation, and the other party does not. So that I feel that this is a matter which ought to be disposed of promptly, and I also feel that, in view of the disclosures in this case, Congress ought to pass a law providing that the Attorney General, or some one else, may institute a proceeding testing the validity of patents, settling the rights of parties on both sides—at least, as to the validity and as to the construction of the patent. Of course, anybody can see, in a field of this kind, which extends so far, that until these patents are settled they will always be an obstacle, or always may be an obstacle, to the development of the art, and to the utilization by communities of the best there is in bridge engineering. Plaintiff has certain rights, or he has not, and the plaintiff in this length of time certainly should have some of these rights determined finally. I do not know whose fault it is, but so far as the case which Judge Lewis decided so long ago, which has been lying there two years after his decision was rendered, with the rights of the public still in the balance, it is all wrong. The final decision of that matter should and would aid very materially the rights of the plaintiff here, and the rights of the public. There is something wrong.

[1] Well, now, in this first group of claims under patent No. 852,-970, nobody claims that this pavement under a bridge is new. No one claims that the method provided for putting in this pavement is new; but what plaintiff claims is, as I understand it, that the tapering edge extending into the bed of the stream is a new invention. Well, if there is any invention about it, I do not think it is new. Without going into the evidence, the publication in the Engineering News in 1891 is such that I feel that any mechanic, called upon to do that work, would do it, if he was sufficiently well educated to understand the matter, in the manner pointed out by Mr. Luten in his patent. This Engineering News says:

"Wherever water is to be carried, it is very necessary to protect both ends by sheet pile aprons or curb walls, as shown in Figures 1 and 3. This is needed as much, if not more, at lower than at upper ends, because if water is at all rapid, and material soft, failure most frequently takes place at lower ends, as shown by the line of scour in Figure 3.

"A filling of large and small broken stones to carry this protection still farther is desirable, and, in case of a rapid fall in the water surface, several cross-walls to protect the scour are often useful. Sheet piles can be used instead of cross-walls, if always wet."

And further:

"These remarks cover an important and much-neglected matter. Our observation is that the protection is needed very much more at the lower end than the upper. Great carelessness is often shown in this respect, when great care should rather be used to carry the water safely away from the structure."

In other words, anybody with powers of observation and experience in handling beds of streams—trying to pave the bed of a stream—would know instinctively, when he saw the paving tapering off there, that if it stopped with the actual technical bottom of the stream the

effect of the current would be to do the very thing described in this Engineering News. The very danger that the Engineering News gives for the protection of the lower end must be provided against, or else you would have a washout, and of course any one could see, without the exercise of any inventive genius, that a floor on the bottom of the stream, just level with the bottom of the stream, not extending into it.to any degree, would simply invite a counter-current under the edge there, which would wash it out. In this patent, of course, it shows the curve of the whole paving downward, to and into the bottom of the stream; but that is not essential at all. It does not make any difference, nor is it any advantage, what form the bottom of the paving is. The only thing that is of importance is what is the form of the top of the paving. In other words, if you put paving in there a foot deep in the bottom of the stream, and have the lower edge taper off in the form described by Mr. Luten, I assume that you have the same thing exactly as if you had a three-inch paving, which curved down and extended into the bed of the stream to the same degree that the surface of the other pavement extended. I do not think, in the state of the art at the time that this patent was granted, that Mr. Luten's patent is of any validity.

Now, group 2 is under patent No. 852,970. That relates to the extending of the spandrel and the wing walls. I have not yet been able to determine what Mr. Luten claims to have invented. I understand, of course, what he has described in his application, and what is described in the patent. I understand the purpose which he claims this construction will serve; but the particular thing invented I have not yet been able to grasp. It is not disputed that the extension of the spandrel was old. There cannot be any question about that. It did extend, prior to that time, sometimes to a greater or less degree, beyond the pier. Of course, if it was old and varied in its extension, then it became simply a matter of experience and custom of those skilled in the art, working in the peculiar roadway involved in each particular case, as to how far the spandrel ought to extend out—how far it would have advantage in extending out, depending, of course, upon the length of the bridge and other things; and there is no claim here that the extension of the spandrel is a patentable novelty, or was at that time.

As to the wing wall, it is nothing more or less than a retaining wall, which probably has been in use as long as civilization has existed, because I apprehend that even the savage, if there was a bank of earth liable to wash down by the rains upon the back end of his tent, would go out and take stones or other material and try in a crude way to retain it from sliding. Now, whether you need a retaining wall in connection with a bridge, or not, depends, of course, upon the nature of the soil, the height of the banks, the extent to which the spandrel goes, and all those things. But I can find no patentable novelty or patentable idea in combining the old extended spandrel and the old retaining wall. It is true that Mr. Luten may have added very materially to the usefulness of the art of building bridges by pointing out a way in which the amount of material necessary for the retaining wall might be reduced by the proper conformation of the embankment or fill which

might be possible with an extended spandrel; but this mere reduction of the amount of material, after all, is purely an engineering proposition, and, while to the layman it may seem to involve invention to reduce materially the amount adequate to stand strain, to the mind of the engineer it is just as simple as the adjustment of battens on the cracks of a barn to the ordinary man—or should be, at least. It is simply the application of knowledge which he possesses. In judging whether these things involve inventive genius, we have got to consider the field of scientific knowledge in which the party undertook to work. Things that might seem very dense to us, who are not educated in that field, would be matters of common knowledge there.

I thought yesterday, when counsel was referring to the opinion of Judge Orr in the Melber Case, that this language was peculiarly apt as applied to the claims put forth on this particular group:

"A man is not entitled to a patent for a structure which is old, just because he determines the reason why the structure should be used."

Now, it may be that nine-tenths of the men who build circular cisterns do not know or understand the reason why they can build a solid, strong structure with so few brick; they do not understand the arch construction, which gives support, one brick to another, all the way around; but it does it, and it has been done right along. If some man comes along and points out that masons are using too many brick, that all pressure and strains can be met by a wall half the thickness of the structure usually constructed under the methods employed by cistern builders, he has not invented anything at all; he has merely pointed out something that any competent person with knowledge, who sits down and studies the situation, would know.

[2] Now, as to group 3, under patent No. 853,202, I cannot agree that this extended rod or wire, or support across, is, or was at the time this patent was issued, a patentable invention. It is true that I have not given the study to this matter that possibly the subject requires; but I gave it considerable study at the time of the trial of the Thacher Case, and I have very grave doubts whether any of this method of reinforcing is patentable invention, or has been for 20 years, or has been at all after some man first found that reinforcing could be put into concrete and maintained, and that it would add to its strength. Once you have settled the problem that reinforcing can be added to concrete formation by the use of wires and rods, and that it is possible to form these structures and maintain them intact, and give them strength and power because of this reinforcement, all the rest is a matter of engineering knowledge, pure and simple. The cantilever principle which Mr. Luten sought to apply in this patent, of course, was old and well known. The cantilever principle has been applied in a thousand ways to bridges and other structures, and I do not believe that, because a man uses it in a particular structure in which it was never used before, he can get a patent on that structure, or the form of use in that structure. It is a matter of simply sitting down and figuring it out with a pencil and paper (that is, for the skilled engineer), where the reinforcement ought to go, in order to bring the best support to the structure; and, as I understand, it is a matter which any competent engineer can

figure out. Some of them, I admit, are more skillful than others, being perhaps better able to figure it out; but I do not believe that, because one man is more skillful in that particular science than some other man, what he figures out purely, I might say, as a mathematical problem, is invention, and I do not believe that it is patentable.

I do feel that somewhere along the progress of the art, when somebody discovered that it was possible to use these rods, and that they might be utilized to good advantage in particular work, that he may have exercised inventive genius in bringing that knowledge to the world; but certainly after the Monier patent, and certainly after the disclosures made by the publications in the field of knowledge in which Mr. Luten worked, and certainly after the extensive discussion and great public interest in the work of reinforcement, I do not feel that anybody, who in his structure simply applies well-settled principles of mathematics applied to strain, has any patentable invention.

Judge Lewis says something about that, and his remarks ought to be approved. He says:

"The complainant as a witness disclaimed that his patents, or any of them, embodied anything beyond or more than placing the steel in a new way that produces better results in a more efficient form. Now, in a concrete bridge, the greatest efficiency is always secured by resisting tension or pull with steel rods. That has been established for a half century; not perhaps with curved tension members, but the basic idea is very old. There is no question about that."

This relates to the claims of complainant in this case, as I understand Judge Lewis' opinion. Judge Lewis continues:

"But none of complainant's patents in its specifications, including drawings, and in the claims, gives any specific direction as to just where any of the reinforcing members should be placed. This I suppose would in each instance depend upon the maximum load to be carried."

In other words, strictly speaking, the contention here must logically end in the proposition that you have patented a principle and not a structure. Again, Judge Lewis says:

"This I suppose would in each instance depend upon the maximum load to be carried, the length of the spans, and other elements which involve mechanics only, and would necessarily, I assume, be worked out in determining the amount of compression and tension under the established formulas in statics. In a general way the points of greatest stress can be roughly approximated without the use of mathematical tables, but this is centuries old—that is, it is open to common observation, and the fundamental purpose of reinforcing concrete was to strengthen the structure at these points; such a discovery in Luten's day is no evidence of inventive genius."

I agree with that statement of Judge Lewis. Somewhere along in civilization, humanity got to the point where they came to use barbed wire fences; before that it was a smooth wire fence. The man who put up the first wire fence of any character found that he had to have his corner posts stayed in some way or his fence would fall down. From that time, and since, there have been various devices produced to better stay the corner posts. The first man that put a stay there may have fastened it on the post 4 feet from the ground, and may have carried it back 8 feet into the earth, and his fence may have slackened

254 F.—45

because the post gave way in 6 months or a year. Some other man came along, and fastened the wire to the top of the post, and carried it back 20 feet, and better results were obtained. I do not think he has invented anything at all. I think he has simply applied the ordinary rules of mechanics to a situation the whole field of which was disclosed in the first conception of bracing a post in that way. The rest was a mere matter of detail in carrying it out, depending upon the height of the post and the weight of the fence. Another man comes along, and to hold the fence he uses a brace on the inside, and I do not think he invented anything. Now, to the mind of the skilled and educated engineer these bridges are but to a large extent corner fence posts. Simple to their mind and complex to ours. And in the varying applications of supports to strains and stresses they are not using inventive genius. I cannot sustain this patent. Aside from the considerations I have already expressed, long before this patent was granted, Monier and Von Emperger had given it to the world—not, perhaps, the particular piece of wire or iron which the Luten patent contemplated, but the method of doing that very thing. The art is old.

[3] Now, patent No. 853,203, of 1907, relates to the arch supported on abutments or piers, as shown in claim 1:

"An arch supported on abutments or piers having tension members embedded near its concave surface, and other tension members passing back and forth through the material of the arch and between the first-mentioned tension members and the adjacent surface, substantially as described."

What I have said with regard to the previous patent, No. 853,202, is applicable to this as well. I have also given some consideration to the questions involved in a similar claim in the Thacher Case, and I feel that, if this patent be valid at all, in view of the prior art, it would be so narrow that this construction of the defendant would not be an infringement. My own judgment, with all the consideration I have given to the matter, is that, in the description of the invention in this patent, the inventor or patentee simply disclosed an application of the knowledge which at that time had been disclosed by engineers and publications and patents. True, he may have given some study to it; but his conclusion from that study was not inventive. It was merely demonstrative—the application of well-settled, well-disclosed principles to peculiar conditions, which vary in each structure, perhaps. But if I should be wrong, if he got something in that patent, it must be limited simply to the very thing that he has disclosed, and that very thing, in my judgment, is not infringed in this case. I need not say more about that, because I have already considered this same question—not upon the same patents, of course, but in the Thacher Case, where the same principles were involved.

[4] Now, as to group 5, patent No. 934,411, which pertains to the wall with the coping of such top formation as to divert attention from the defects of the lower wall: There Mr. Luten was applying knowledge which has existed ever since men have understood the placing of lights and shadows in art. So far as that being the particular function of the structure is concerned, I do not think it is patentable at all. He did no more, in that, so far as that particular purpose is concerned,

than the men over in France who are now doing the camouflage for the army. If that wall for that purpose was patentable, then every gun over there, with its barrel painted to represent a zebra or some other animal, to try to conceal its presence from the enemy, is patentable. As I see it, the principle involved in the patent is simply to adopt a method that will attract attention to one feature of an object and detract from another. It is simply the application of the known peculiarities of humanity that we usually think about only one thing at a time; and if you can attract attention to the top of this wall, we do not see the rest. I think it was Josh Billings who disclosed the same theory to us when he said that tight boots were the greatest blessing of humanity, because they made a man forget all of his other miseries. I do not think there is anything patentable in that, at all. In so far, now, as he did create a method of putting on a coping, which would be more effective, or which might be easier constructed, or having some other valuable purpose in the construction of a wall, there might be a chance for a patentable invention.

But it is quite apparent to me that, in that particular structure which he describes, he was not doing any more than applying matters of knowledge common at that time. The building of a wall partially, and then allowing it to harden, and then building on an additional portion on top, whether it takes the form of a coping or the mere extension of the same size wall, I do not think is claimed to have been new. I think it must be conceded, in view of the record here, that it was in common use. When I say "common use," and when we talk about "common use," with relation to this art, of course, it does not mean what is ordinarily meant by the word "common," because back at that time there was very little of this concrete used. It was in the beginning of the development of the art, the building of concrete bridges and concrete structures, so that I could not say it was an everyday event; but what I mean is that such structures were actually in use and built before this patent was issued, in a manner practically as described in the patent. In other words, I see nothing in the patent of an inventive nature to improve on the methods the other fellows employed in the manner of building the coping or tops of walls. For that reason I cannot sustain that claim, and the complainant's petition is dismissed, and judgment will be allowed against him for costs.